UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

**FILED**
JUN 15 2005

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | CR. 05-40031 |
| Plaintiff, | * | |
| vs. | * | REPORT and RECOMMENDATION |
| | * | (Motion to Suppress) |
| LAWRENCE CRAIN, a/k/a Lawrence Craine, | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Pending is Defendant's Motion to Suppress Statements (Doc. 16). A hearing was held on Thursday, May 26, 2005. Defendant was personally present and represented by his counsel of record, Assistant Federal Public Defender Timothy Langley. The Government was represented by Assistant United States Attorney Mike Ridgway. The Defendant, Mr. Lawrence Crain, and Federal Bureau of Investigation Special Agents Anulfo (Arnie) Medrano and Patrick Baldree testified at the hearing. Additionally, both parties have submitted briefs and oral argument was heard at the conclusion of the hearing. Based on a careful consideration of all of the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

### RECOMMENDATION

It is respectfully recommended that Defendant's Motion to Suppress be **DENIED**.

### JURISDICTION

Defendant is charged in an Indictment with Access Device Fraud and Aggravated Identity Theft in violation of 18 U.S.C. §§ 1029(a)(2) and 1029(a)(3) and 18 U.S.C. §1028A(a)(1). The pending Motion to Suppress was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Judge Piersol's Standing Order dated February 1, 2002.

### FACTUAL BACKGROUND

FBI Agents Arnulfo (Arnie) Medrano and Patrick Baldree are stationed in Los Angeles, California. TR 5, 26. A lead on a bank fraud matter came into their office from another agent in

Sioux Falls, South Dakota in January, 2005, regarding the Defendant, Lawrence Crain. TR 5-6. The matter was assigned to Agent Baldree, and he requested assistance from Agent Medrano. TR 5.

Agent Baldree ran Department of Motor Vehicle and NCIC checks on Mr. Crain, to determine his probable address and his criminal history. TR 5, 19, 39. The two Agents went to Mr. Crain's residence on January 13, 2005, between 9:00 and 10:00 a.m. to interview him. TR 6, 36. They arrived in an unmarked government vehicle. TR 6, 28. Both Agents were dressed in plain clothes and were armed, but their weapons were not visible. TR 8, 28. When they knocked on the front door, a young man answered and told them Mr. Crain was sleeping. TR 6, 29. The agents asked if Mr. Crain could be awakened to speak with them, and the young man went to check. TR 6, 29. The Agents waited, and Mr. Crain eventually appeared after about five minutes. TR 6-7, 29.

The home where Mr. Crain lived had a small front porch, with three steps leading up to it. TR 7. When Mr. Crain came out of the house, the agents retreated down the stairs and stood on the ground below, leaving Mr. Crain on the porch. TR 7, 30. The agents stood between five and seven feet away from Mr. Crain, except when they had to lean closer to show him their documentation. TR 14, 43. The agents verified Mr. Crain's identity, identified themselves by showing their credentials, shook hands, and advised Mr. Crain they wanted to speak with him. TR 7, 30. Agent Medrano told Mr. Crain they just wanted to talk with him, that he was not under arrest, and asked if he (Crain) minded talking with them. TR 7. Mr. Crain said he did not mind. TR 7.

Mr. Crain had just awoken, and appeared very calm, relaxed and quiet. TR 8.[1] The agents asked if Mr. Crain had submitted credit card applications to Total Card, Inc, and at first, Mr. Crain denied it. TR 8-9, 31. Agent Medrano did the initial questioning. TR 31. Mr. Crain denied the first four or five questions, but then admitted his involvement after he returned from inside the house to look for his California driver's license and social security card, which he said he had misplaced. TR

---

[1] Mr. Crain went to school through the eleventh grade. TR 52. He has been on Social Security Disability since 1976. TR 53. He has a bad heart, broke his knee twice, uses crutches, has a "messed up" back, and has broken his ribs. Id. He also has high blood pressure. For all of these conditions, he estimated at the time he was interviewed by Agents Medrano and Baldree, he was taking approximately ten different medications each morning. TR 54. He said the medications generally made him tired and forgetful. TR 55.

9, 31-32. The agents asked him about a discrepancy between the name on his social security card and on his driver's license. At that point, Mr. Crain decided to be forthcoming about his involvement with credit card fraud activities, and the agents said they knew he was involved. TR 9, 32.

After the initial questions, Agent Baldree conducted the majority of the interview, because the case had been assigned to him. TR 11. The Agents questioned Mr. Crain about the different spellings he'd used for his last name, and his correct birth date. TR 10. After Mr. Crain admitted sending multiple credit card applications over the internet, the agents showed him a spreadsheet they brought with them containing information about 300 applications for credit cards allegedly made by Mr. Crain. TR 11-12. They asked him about some of the names on the list, and Mr. Crain identified some of them. Id. Mr. Crain identified one name as a homeless man who had asked Mr. Crain to apply for a credit card for him; another was a former associate whose name Mr. Crain had used without permission, another was a deceased person whose identity Mr. Crain has used to apply for a credit card. TR 34-35.

The agents asked if Mr. Crain had any of the credit cards for which he had applied in his possession, and Mr. Crain produced two credit cards. TR 12. Mr. Crain could not recall applying for the cards, but stated he had not activated them. Id. Mr. Crain admitted he had been convicted of credit card fraud in the past, and spoke briefly about how he learned to fraudulently obtain credit cards by slightly changing his biographical information on the application (from a woman named "Fanny"). TR 35-36.

The interview lasted approximately a half hour. TR 13, 36. Mr. Crain went into the home, unaccompanied by the Agents, twice during the interview: once to try to find his driver's license and social security card and the other time to retrieve the two credit cards. TR 20-21. At no time did either Agent threaten Mr. Crain, or raise their voices. TR 13. Mr. Crain was not "frisked" or searched. TR 14. Both Agents described the interview as very low key. TR 13, 37. Mr. Crain smoked throughout the interview, and the agents described him as very relaxed and comfortable. TR 13, 37. Mr. Crain did not refuse to answer questions, and never asked the Agents to stop questioning him or to leave. TR 37. The Agents did not use any threats or heavy-handed tactics.

TR 37-38. No *Miranda* warnings were given to Mr. Crain. TR 38. Agent Medrano stated "it was such a low key interview it never played into our mind that there was ever an allusion that the person would believe he was under arrest." TR 18. The interview ended as it began, with the Agents shaking Mr. Crain's hand. TR 36. Mr. Crain thanked the Agents and told them to stop again if they needed to ask more questions. TR 37. Mr. Crain was not placed under arrest, and he waved to the Agents as they drove away. Id.

## DISCUSSION

As a general rule, the burden of proof is on the defendant who seeks to suppress evidence. United States v. Phillips, 540 F.2d 319 (8th Cir.1976) cert. denied, 429 U.S. 1000, 97 S.Ct. 530, 50 L.Ed.2d 611 (1976). The Government, however, bears the burden of proving by a preponderance of the evidence that Miranda warnings were either not necessary or that they were given and effectively waived. Miranda v. Arizona, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966); United States v. Short, 790 F.2d 464, 467-68 (6th Cir. 1986); United States v. Charbonneau, 979 F.Supp. 1177, 1181 (S.D. Ohio 1997).

*Miranda* warnings are required prior to a custodial interrogation. An individual is in custody when he has been formally arrested or his freedom of movement has been restrained to a degree associated with a formal arrest. Relevant inquiries are whether the suspect is free to leave the scene, the purpose, place, and length of the questioning, and whether a reasonable person in the suspect's position would have considered himself to be in custody. The mere fact that an investigation has focused on a particular suspect does not trigger the need for *Miranda* warnings in noncustodial settings. United States v. Goudreau, 854 F.2d 1097, 1098 (8th Cir. 1988) (citations omitted). Also, "[i]n determining whether a suspect is 'in custody' the relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." United States v. Carter, 884 F.2d 368, 370 (8th Cir. 1989)(citations omitted). In other words, "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Thatsaphone v. Weber, 137 F.3d 1041, 1045 (8th Cir. 1998) (citations omitted) cert. den., 523 U.S. 1130, 118 S.Ct. 1822, 140 L.Ed.2d 958 (1998). The Court must, on a case-by-case basis, examine the totality of the circumstances,

including the extent of the physical or psychological restraints placed on the suspect during the interrogation. United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990). Further,

> A consistent line of inquiry has developed from this case-by-case approach which has identified several common indicia of custody. These indicia of custody relate to he specific police practices employed during questioning which tend to either mitigate or aggravate an atmosphere of custodial interrogation. This inquiry into the indicia of custody has generally focused on an examination of (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

Id. at 1349. The indicia of custody in Griffin "are by no means exhaustive and should not be applied ritualistically, counting indicia which contribute to custody against those which detract." United States v. Brave Heart, 397 F.3d 1035, 1039 (8th Cir. 2005). The most obvious and effective means of demonstrating to a suspect he is not in custody is to advise him he is not under arrest and that his participation in the interview is voluntary. Id. "The ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest." United States v. Czichray, 378 F.3d 822, 828 (8th Cir. 2004) cert. den. 2005 WL 40906. The "only relevant inquiry" is whether a reasonable person in the Defendant's position would have felt at liberty to end the interrogation and leave. Brave Heart, 397 F.3d at 1038.

Applying these principles, Mr. Crain's January 13th interview was not custodial. After the introductions, the Agents began the interview by telling Mr. Crain he was not under arrest and asking if he "minded" talking with them. Mr. Crain agreed, and the Agents remained at the bottom of the porch (five to seven feet away from Mr. Crain) throughout the interview. The interview was by all accounts cordial, the Agents never frisked or searched Mr. Crain, who returned into the house unaccompanied twice, remained calm, never asked the Agents to stop the questioning or to leave, and smoked through the whole encounter. Not only was Mr. Crain not arrested at the conclusion of the very short interview, but he shook the Agents hands, thanked them, invited them to stop again, and waved goodbye when they left. Mr. Crain was not restrained as though he was under formal

arrest, and any reasonable person in his position[2] would have felt at liberty to end the interview and leave (or in this case, walk into his house and shut the door).

## CONCLUSION

Mr. Crain's January 13th interview was not custodial, and no reasonable person in his position would have believed otherwise. He was not restrained at all, let alone to a degree associated with formal arrest. It is therefore respectfully recommended to the District Court that Mr. Crain's Motion to Suppress (Doc. 16) be **DENIED**.

## NOTICE TO PARTIES

The parties have ten (10) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.

Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990)
Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

Dated this 15 day of June, 2005.

BY THE COURT:

_____
John E. Simko
United States Magistrate Judge

ATTEST:
JOSEPH HAAS, Clerk

By _Shelly Margulies_, Deputy

---

[2] While Mr. Crain did not so state at the suppression hearing, his counsel suggested during his closing remarks that Mr. Crain's medications may have caused him to be confused about whether the interview was custodial. The Agents, however, were both credible witnesses, and they testified Mr. Crain was able to answer their questions about the specific names on the spreadsheet list, and Agent Baldree did not agree Mr. Crain was "unusually pliable." TR 42.